| | |
|---|---|
| DISTRICT COURT, WELD COUNTY, COLORADO<br><br>901 9th Ave<br>P.O. Box 2038 (80632)<br>Greeley, CO 80631 | DATE FILED: July 8, 2020 1:00 PM<br>FILING ID: A0D1FE8C401FA<br>CASE NUMBER: 2020CV30475 |
| TOWN OF ERIE,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,<br><br>Defendant. | |
| | ▲ COURT USE ONLY ▲ |
| J. Andrew Nathan, Reg. No. 3295<br>Nicholas C. Poppe, Reg. No. 47507<br>NATHAN DUMM & MAYER P.C.<br>7900 E. Union Avenue, Suite 600<br>Denver, CO 80237-2776<br>Phone Number: (303) 691-3737<br>Email: *anathan@ndm-law.com;*<br>   *npoppe@ndm-law.com* | Case Number:<br>Div.:      Ctrm: |
| **COMPLAINT AND JURY DEMAND** ||

COMES NOW the Plaintiff, the Town of Erie ("Erie"), by and through its attorneys at Nathan Dumm & Mayer P.C., and, for its Complaint, states and alleges as follows:

**PARTIES AND JURISDICTION**

1.      Erie is a statutory town located in Boulder and Weld counties, Colorado.

2.      National Union Fire Insurance Company of Pittsburgh, PA ("National Union") is an insurance company registered in Pennsylvania with a principal business address of 175 Water Street, New York, New York, 10038. National Union is licensed to provide insurance in the State of Colorado.

3.     The underlying events giving rise to this action occurred in the Town of Erie, which is located partially in Weld County, Colorado.

4.     Venue is proper in Weld County pursuant to C.R.C.P. 98 because the underlying events occurred in Weld County and because National Union is a nonresident of this state.

5.     The Court has jurisdiction over this case pursuant to C.R.S. § 13-1-124.

### GENERAL ALLEGATIONS

6.     Erie incorporates all prior allegations as though fully set forth herein.

7.     In 2019, Erie had an ongoing business relationship with SEMA Construction, Inc.

8.     On October 21, 2019, an unknown criminal actor accessed Erie's website and obtained a Vendor ACH Payment Enrollment Form ("ACH form").

9.     The criminal actor then completed the ACH form, purportedly on behalf of SEMA Construction, Inc., and uploaded it to Erie's website.

10.     The uploaded ACH form, which appeared to have information consistent with SEMA Construction's actual operations, was automatically routed through Erie's computer server to Erie's Finance Department.

11.     The ACH form directed Erie's Finance Department to alter the method of payment for SEMA Construction from check to electronic (ACH) payments.

12.     The bank account information allegedly provided for SEMA Construction was fraudulent; instead of directing funds to SEMA, the ACH form directed payment to an unrelated escrow account.

13.     Erie, acting upon the uploaded information, altered payment methods and accounts for SEMA Construction.

14.     On October 25, 2019, pursuant to the fraudulent ACH Form uploaded to Erie's server, electronic payments totaling $1,106,233.80 for the July and August invoices were sent to a Citibank escrow account in Florida, purportedly on behalf of SEMA Construction.

15.     From Florida, the electronic funds were apparently routed to other banks in Mexico and Dubai.

16.     On November 5, 2019, Erie was notified of possible fraud with respect to the October 25, 2019 payments.

17.     On the same day, Erie contacted SEMA Construction, which indicated it had not received payment for its July or August invoices and had not enrolled in electronic ACH payments.

18.     Shortly thereafter, the FBI was contacted to assist Erie's investigation into possible fraud.

19.     In December 2019, Erie's police department indicated it was no longer investigating any suspected criminal culpability by Town employees, but rather had concluded the fraud had been perpetrated by outside criminal actors.

20.     Erie was the victim of computer fraud and forgery and suffered a loss in the total amount of $1,106,233.80.

## INSURANCE POLICY

21.     Erie incorporates all prior allegations as though fully set forth herein.

22.     National Union issued Government Crime Policy No. 06-182-35-66 with an effective date of January 1, 2019 to January 1, 2020 ("the Policy") to Participating Members of

the Colorado Intergovernmental Risk Sharing Agency. Erie was a Participating Member of CIRSA and an Additional Named Insured under Endorsement 2 of the Policy.

23.     On November 14, 2019, Erie submitted a claim and proof of loss for $1,016,233.80 to National Union.

24.     Per the Declarations for the Policy, National Union agreed, in part, to provide coverage in the amount of $2 million per occurrence for a loss attributed to "Forgery or Alteration," or "Computer Fraud."

25.      In part, the Policy [Attached as Exhibit 1 to this complaint and incorporated herein] provides coverage to the Town as follows:

> 3. Forgery Or Alteration
>
> a.     We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:
>
>> 1.     Made or drawn by or drawn upon you; or
>>
>> 2.     Made or drawn by one acting as your agent;
>>
>> or that are purported to have been so made or drawn.
>
> …
>
> 7. Computer Fraud
>
> We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":
>
> a.     To a person (other than a "messenger") outside those "premises"; or
> b.     To a place outside those "premises".

8. Funds Transfer Fraud

We will pay for loss of "funds" resulting directly from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

26.      The definitions section of the Policy contains the following:

6. "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

7. "Fraudulent instruction" means:

a. An electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by you, but which was in fact fraudulently transmitted by someone else without your knowledge or consent;

b. A written instruction (other than those described in Insuring Agreement A.3.) issued by you, which was forged or altered by someone other than you without your knowledge or consent, or which purports to knowledge or consent, or which purports to have been issued by you, but was in fact fraudulently issued without your knowledge or consent; or

c. An electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by you which purports to have been transmitted by an "employee" but which was in fact fraudulently transmitted by someone else without your or the "employee's" knowledge or consent.

27.      The coverage for "Funds Transfer Fraud" is limited to any "loss of 'funds' resulting directly from a 'fraudulent instruction' directing a financial institution to transfer, pay or deliver 'funds' from your 'transfer account.'"

28.     The coverage for Funds Transfer Fraud is not applicable to the Town's claim or loss because the fraudulent use of the Town's ACH form does not fall within the Policy's definition of "Fraudulent instruction."

29.     Instead, the Town's claim falls within the coverage for "Computer Fraud," as the Town suffered loss or damage to money resulting directly from the use of a computer to fraudulently cause a transfer of money from the Town's banking premises to a place outside of those premises.

30.     Also, the Town's claim falls within the coverage for "Forgery or Alteration" because the ACH form was a "forgery" that constituted orders or directions to pay a sum of money.

31.     Endorsement No. 12 of the policy states:

1. Insuring Agreement "Funds Transfer Fraud" is amended by adding the following to the end thereof:

Impersonation Fraud Coverage

We will also pay for loss of "funds" resulting directly from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account."

Notwithstanding the above requirement that the loss of "funds" result directly from a "fraudulent instruction," we will also pay for the loss of "fund" resulting from your receipt of a "fraudulent instruction" from a purported vendor, which advised you that the vendor's bank account information has been changed and you suffer a loss of "funds".

2. Solely with respect to Impersonation Fraud Coverage provided by this endorsement, in Section F. Definitions, the definition of "Fraudulent Instruction" is deleted in its entirety and replaced with the following:

"Fraudulent instruction" means an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction communicated by you or

your "employee" based upon an instruction received and relied upon by you or your "employee" which was transmitted:

      a. by a purported director, officer, partner, member or sole proprietor of yours or by another "employee" – or by an individual acting in collusion with such purported director, officer, partner, member, sole proprietor or other "employee" – but which was in fact fraudulently transmitted by someone else without your or your "employee's" knowledge; or

      b. by a purported director, officer, partner, member, sole proprietor or employee of your "vendor" or "client" – or by an individual acting in collusion with such purported director, officer, or employee – but which was in fact fraudulently transmitted by someone else without your or your "employee's" knowledge; provided, however, "fraudulent instruction" shall not include any such instruction transmitted by an actual director, officer, partner, member, sole proprietor or employee of your "vendor" or "client" who was acting in collusion with any third party in submitting such instruction.

3. Solely for purposes of this endorsement, the following definitions are added:

"Vendor" means any person, firm, company, corporation, organization, association or other entity that provides goods or services to you pursuant to a legitimate relationship that pre-exists the loss of "funds" that is the subject of the coverage provided by this endorsement.

"Client" means any person, firm, company, corporation, organization, association, or other entity to whom you provide goods or services for a fee pursuant to a legitimate written contract that pre-exists the loss of "funds" that is the subject of the coverage provided by this endorsement.

4. Out total liability for coverage provided by this endorsement for all loss arising from a single act or series of related acts is *$100,000* ("Impersonation Fraud Limit").  All amounts paid by us pursuant to this endorsement will be part of, and not in addition to, the applicable Limit of Insurance shown in the Declarations.

5. Solely with respect to coverage provided by this endorsement, the applicable per occurrence Deductible Amount is *$150,000*.

6. Solely for purposes of this endorsement, the following exclusion shall apply:

> The coverage afforded by this endorsement does not apply to any loss occurring prior to *January 1, 2018*.
>
> 7. The most we will pay for all loss resulting directly from an "occurrence" under this endorsement is the Impersonation Fraud Limit shown in Section 4 above.

32.     While purporting to provide additional coverage for no additional premium, it is National Union's position that Endorsement #12 severely undercut coverage elsewhere in the Policy, eliminating the $2 million coverage otherwise available under other Insuring Agreements, and instead providing only a $100,000 limit of liability for Impersonation Fraud.

33.     The "Impersonation Fraud Limit" does not appear on the Declarations page of the Policy, nor is there any direct reference to the sublimit in the original Policy itself

34.     The Impersonation Fraud Coverage also contains similar typeface conventions to all other coverages in the Policy and is specifically described as a "coverage" and not as an exclusion of or limitation on coverage.

35.     Nowhere in Endorsement #12 does it state that coverage under the Endorsement is or may be an exclusion of or denial of coverage under other portions of the Policy.  This is in contrast with other endorsements to the Policy, which specifically state, in bold and all capitalized letters, "EXCLUSION."

36.     Besides Endorsement #12, none of the other Endorsements excluding coverage contain the language "in consideration of the additional premium…." Such language, to the average reader, would signal an *increase* in coverage, not an exclusion of coverage.

37.     As stated plainly in paragraph two of Endorsement #12: "*Solely with respect* to Impersonation Fraud Coverage provided by this endorsement, in Section F. Definitions, the

definition of "Fraudulent Instruction" is deleted in its entirety and replaced with the following…" (emphasis added).  As alleged, Endorsement 12 also contains other definitions solely related to this coverage.

38.     The limited scope of the definition for "Fraudulent instruction" in Endorsement #12 does not operate to change the definition of "Fraudulent instruction" for all other terms and coverages in the Policy.

**NATIONAL UNION'S BREACH OF THE POLICY**

39.     Erie incorporates all prior allegations as though fully set forth herein.

40.     Erie timely submitted a claim and notice of loss to AIG Claims, Inc., claims handler for National Union.

41.     Erie fully cooperated with AIG Claims, Inc. and National Union in connection with its claim.

42.     Despite language in the Policy to the contrary, National Union has wrongfully taken the position that Erie's only coverage for this matter is for "Impersonation Fraud Coverage."

43.     Alternatively, the policy language under which National Union denied coverage for the entire loss is ambiguous.  The Policy and Endorsements were not negotiated and, as such, are construed most strictly against National Union.

44.     These ambiguities include, for example:

    a.  Application and interpretation of section 2 of Endorsement #12;

    b.  Application and interpretation of Endorsement #12 generally;

    c.  Application and interpretation of Insuring Agreement A.7;

    d.   Application and interpretation of Insuring Agreement A.8;

    e.   Application and interpretation of Exclusion #4;

    f.   Application and interpretation of Exclusion #5;

    g.   The collective interpretation of the aforementioned provisions in the Policy

45.     On or about February 24, 2020, Erie sent a letter to National Union and AIG Claims, Inc. explaining why National Union and AIG Claims, Inc.'s interpretation of the Policy was erroneous, contrary to the reasonable expectations doctrine, and contrary to the weight of legal authority construing identical or similar provisions in insurance policies.

46.     National Union and AIG Claims, Inc. failed to respond for over five weeks. When they did respond, National Union and AIG Claims, Inc. failed to rebut any of the assertions made by Erie concerning coverage under the Policy and continued to unreasonably deny coverage under the Computer Fraud and Forgery coverages.

47.     On or about April 10, 2020, Erie corresponded again with National Union and AIG Claims, Inc. regarding coverage under the Policy. National Union and AIG Claims, Inc. failed to respond to Erie's most recent correspondence, effectively continuing the unreasonable denial of coverage to Erie.

48.     Despite having coverage for $2 million for both "Computer Fraud" and "Forgery or Alteration," National Union has wrongfully refused to compensate Erie under the Policy and has wrongfully insisted that Erie is entitled to only $100,000 in coverage.

49.     National Union has unreasonably invoked Exclusion #5 from the Policy, which excludes "Computer Fraud" from Insuring Agreement A.8 – Funds Transfer Fraud.

50.     As alleged herein, Erie did not suffer from "Funds Transfer Fraud" as that term is defined in the Policy; therefore, National Union acted unreasonably in denying coverage for Computer Fraud under Exclusion #5.

51.     National Union wrongfully and unreasonably denied coverage under both the Computer Fraud and Forgery or Alteration coverages.

52.     After paying its deductible, and accounting for the $100,000 in coverage actually provided, Erie has sustained damages in the amount of $856,233.80

### FIRST CLAIM FOR RELIEF
#### (*Breach of Contract*)

53.     Erie incorporates all prior allegations as though fully set forth herein.

54.     Erie was the beneficiary of a contract of insurance with National Union.

55.     At all times pertinent, all the premiums required under the contract for insurance were paid to National Union.

56.     Erie advised National Union of the claims and related loss for this incident, and otherwise fully cooperated with National Union with respects to its claims.

57.     Erie is a beneficiary of National Union's insurance policy/contract and is entitled to enforce its terms.

58.     National Union has refused to pay Erie amounts owed to it under the Computer Fraud and Forgery or Alteration coverage.

59.     National Union has therefore breached its contract of insurance.

60.     Erie is entitled to be compensated as a result of the losses it sustained as a consequence of National Union's breach of the contract of insurance.

### SECOND CLAIM FOR RELIEF

(*Violations of Reasonable Expectations*)

61.     Erie incorporates all prior allegations as though fully set forth herein.

62.     Erie had the reasonable expectation that the Policy with National Union would provide full coverage in the amount of $2 million dollars for the fraud suffered by it in October 2019.

63.     The declarations page of the Policy separately identifies the limits of insurance per occurrence for each of the Insuring Agreements, but omits the limits of insurance for Impersonation Fraud.

64.     The limits of insurance for Impersonation Fraud Coverage are not contained in the body of the Policy itself, but rather buried on the last page of an endorsement.

65.     All endorsements within the Policy that contain coverage-reduction limitations state clearly in a prominent box on the first page of the endorsement that an applicable "Limit of Insurance" applies.

66.     The limits of insurance for Impersonation Fraud Coverage are not contained on the first page of Endorsement #12 and are not prominently identified in a similar manner to all other coverage-reduction limitations.

67.     Instead of prominently identifying the coverage-reduction limitations, National Union deceptively states that "in consideration of the additional premium of $0," additional coverage is being provided for impersonation fraud.

68.     A reasonable party reading Endorsement #12 would interpret the language of "in consideration of the additional premium" as providing additional coverage, not the reduction or elimination of pre-existing coverage already provided for under the Policy.

12

69.     A reasonable party reading Endorsement #12 would understand and expect that they were receiving additional, or at least supplemental coverage, beyond the $2 million dollars afforded under the Policy's Insuring Agreements.

70.     This position is validated in part by language in paragraph 4 of Endorsement #12, which states that "amounts paid by us pursuant to this endorsement *will be part of*, and not in addition to, the applicable Limit of Insurance shown in the Declarations."

71.     Any reasonable party reading that language in the endorsement would understand and expect that Endorsement #12 does not prohibit additional coverage under other Insuring Agreements.

72.     National Union has erroneously taken the position that coverage under Endorsement #12 operates to eliminate coverage under other Insuring Agreements in the Policy with respect to Erie's claim and loss.

73.     National Union takes this position not based upon any clearly identifiable language stating such limitations in the Policy or Endorsement, but rather through modifications to the definition of "Fraudulent instruction" in Endorsement #12.

74.     By modifying the definition of "Fraudulent instruction" but not stating the effect of such modification, National Union claims that the modification operates to eliminate coverage of impersonation fraud under other Insuring Agreements, most notably Computer Fraud.

75.     This position is not based upon any clearly identifiable language stating such exclusion in the Policy or Endorsement, but rather relies upon National Union's convoluted interpretation of the Policy.

76.     A party reading Endorsement #12 would not understand and/or expect that an endorsement purporting to give them *additional* coverage would, as claimed by National Union, actually operate to foreclose other coverages while simultaneously reducing the amount of coverage provided for in the Declarations by 95%.

77.     Erie is entitled to its reasonable expectations under the Policy, which National Union breached by asserting that Endorsement #12 forecloses coverage under other Insuring Agreement coverages.

78.     Erie is entitled to damages to compensate it for its reasonable expectations under the Policy and the losses it suffered in October 2019.

### THIRD CLAIM FOR RELIEF
### (*First Party Statutory Claim under C.R.S. § 10-3-1116*)

79.      Erie incorporates all prior allegations as though fully set forth herein.

80.     National Union has denied full payment of benefits to Erie under its Policy without a reasonable basis for its action.

81.     National Union's unreasonable position and conduct have caused damages to Erie.

82.     In accordance with C.R.S. § 10-3-1116, Erie is entitled to recover from National Union two times the covered benefits under the Policy plus reasonable attorney's fees and costs.

WHEREFORE, Erie requests the Court enter judgment against National Union for actual and statutory damages, attorney's fees, costs, expert witness fees, pre- and post-judgment interest as provided by law, and for such other relief as the Court deems just and proper.

### JURY DEMAND

Erie requests a jury trial on all issues so triable.

Respectfully submitted,

NATHAN DUMM & MAYER P.C.


*s/Nick Poppe*
J. Andrew Nathan, #3295
Nicholas C. Poppe, #47507
Attorneys for Town of Erie

Town of Erie
645 Holbrook Street
Erie, CO 80516